******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# IN RE DAMIAN G. ET AL.*
## (AC 40517)

Keller, Elgo and Flynn, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the trial court terminating her parental rights with respect to her minor sons, D and J. *Held*:

1. The trial court's finding that the respondent mother had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, at some future date, she could assume a responsible position in the lives of her children was not clearly erroneous: that court reasonably could have found from the evidence that the mother had not gained insight regarding issues of domestic violence given the evidence concerning the mother's relationship with the children's father, which was marked by a history of serious domestic violence, and her failure to recognize the dangers that his violent, criminal history posed to her and her children, the evidence in the record supported the court's findings that it was not clear whether the mother had, or could maintain, adequate or sufficient income, that she had failed to obtain adequate housing on a timely basis, and that it was unclear whether the mother, who had a lengthy history of being unable consistently to maintain housing and income, would be able to maintain a newly leased apartment for her children, and there was an ample evidentiary basis to support the court's finding, by clear and convincing evidence, that the mother's level of rehabilitation fell short and that the children's need for permanency and stability ultimately should prevail; moreover, the trial court's finding that J had difficulty with transitions was not contrary to the evidence, and although the evidence reflected a finding that the mother may have rehabilitated to some extent during the course of her involvement with the Department of Children and Families since 2012, the evidence supported the trial court's finding that the extent of the deficiencies that continued to exist at the time of trial reflected that the mother was unable to benefit from continued parenting education; furthermore, even if the trial court erred in its interpretation of a report used to assess the mother's insights into issues of domestic violence, the isolated error did not undermine the court's findings as a whole, as the court made many findings that were relevant to an assessment of the mother's ability to parent her children, including findings related to the mother's history of substance abuse, her criminal behavior that directly impacted her ability to be a parent, her poor judgment as reflected in her unstable and, at times, violent relationship with the children's father, her history of failing to provide her children, both of whom had special needs, with an adequate home or care, and her lack of the most basic parenting skills, even with the benefit of parenting counseling, and the mother did not demonstrate that any of those findings lacked support in the evidence.

2. The respondent mother could not prevail on her claim that because several of the trial court's subordinate factual findings in the dispositional phase of the proceeding were clearly erroneous, the court's finding that termination of the mother's parental rights was in the best interests of the children could not stand: contrary to the mother's claim, the court did not state that there was evidence that the children had regressed upon returning to the mother's care, but stated its belief that, if the children were reunited with the mother, they would regress and the mother would become overwhelmed, would not meet their needs adequately, and would not provide them with the consistent stability that their unique developmental challenges required, and those findings were supported by evidence in the record from which the court reasonably could have inferred that reunification with the mother likely would have caused the children to regress in terms of their emotional and developmental progress; moreover, the mother's challenge to the court's findings that she was unable to maintain adequate housing or income, or to absorb insights from her parenting education or from her domestic violence

counseling was unavailing, this court having rejected the mother's claims with respect to the same findings in the adjudicatory phase, and given the mother's failure to demonstrate that any of the trial court's factual findings were clearly erroneous, this court was not left with the definite and firm conviction that the trial court's finding that termination of the mother's parental rights was in the best interests of the children should be disturbed.

Argued October 4—officially released November 16, 2017**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor children, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Driscoll, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Michael S. Taylor*, assigned counsel, with whom was *Marina L. Green*, assigned counsel, for the appellant (respondent mother).

*Parul Patel*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (petitioner).

*Michael F. Miller*, for the minor children.

*Opinion*

KELLER, J. The respondent, Felicia B., appeals from the judgments of the trial court terminating her parental rights with respect to her biological sons, Damian G. and Jeremiah G., pursuant to General Statutes § 17a-112 (j).[1] The respondent claims that the court erroneously found that: (1) she failed to rehabilitate and (2) the termination of her parental rights was in the best interests of the children. We affirm the judgments of the trial court.

On March 29, 2016, the Commissioner of Children and Families (petitioner) petitioned the court to terminate the parental rights of the respondent and Juan G. in their biological sons, Damian and Jeremiah. Following a trial, the court granted the petitions.[2] In its oral decision,[3] the court observed that, after the petitioner filed the present petitions, Juan G. consented to the termination of his parental rights with respect to both children. The respondent, however, contested the petitions. Before setting forth relevant legal principles, the court observed: "As to [the respondent], the [petitioner] . . . claims that it is in the best interests of the boys to terminate [the respondent's] parental rights, that [the Department of Children and Families (department)] . . . made reasonable efforts to reunify the children with [the respondent], or [the respondent] was unable or unwilling to benefit from reunification efforts, that the boys had been found in a prior proceeding to have been neglected, and that [the respondent] had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the children, [the respondent] could assume a responsible position in the lives of her children."

The court went on to find the following facts under the clear and convincing evidence standard of proof: "Damian was born [in] September . . . 2011; Jeremiah was born [in] January . . . 2014. [The respondent] is the mother of both boys. [Juan G.], who consented to the termination of his parental rights, was the father of both boys.

"[The respondent] had a very troubled childhood. She was adopted and raised in New Hampshire and Maine. She acknowledged a significant history of substance abuse which began at the age of eight. She started using alcohol and incorporating marijuana. By age thirteen, she began experimenting with and using heroin. By age sixteen, she was using cocaine. She also reported abusing oxycodone and Vicodin. [The respondent] has an extreme history of substance abuse.

"As well, she reported being traumatized as a child, that trauma includ[ed] sexual abuse, [and] verbal and mental abuse during her childhood. She has not spoken in detail about it. She did report a history of suicidal

ideation and acts, as well as cutting and burning behavior in efforts to harm herself. She did report that those have not occurred for years.

"Following Damian's birth, the department was involved for a period of time in 2012. A period of protective supervision resulted in the closure of the file.[4]

"In August, 2013, [Juan G.] was arrested and incarcerated as a result of a serious domestic violence incident between [Juan G.] and [the respondent].

"On November 12, 2013, the [petitioner] filed a neglect petition and sought an order of temporary custody for Damian. At that time, [the respondent] acknowledged to the department that she had relapsed and begun using heroin approximately three months earlier, which would coincide with the date of [Juan G.'s] removal from the home by the authorities. [The respondent] was pregnant with Jeremiah at the time.

"The order of temporary custody was granted on November 12, 2013, for Damian, and sustained on November 22, 2013, by agreement. At that time, it was reported that [the respondent] was seeking mental health and substance abuse treatment at Wellmore in Waterbury and was pregnant with Jeremiah.

"On December 18, 2013, [the respondent] and [Juan G.] submitted pleas of nolo contendere, and Damian was adjudicated neglected and committed to the [department]. Specific steps for reunification were set and signed by [the respondent] on that date.[5] [The respondent] at that time was at the Crossroads Amethyst House program.

"Jeremiah was born [in] January . . . 2014, and discharged from the hospital with [the respondent] for continued placement at the Crossroads program.

"On April 1, 2014, a motion to open and modify disposition as to Damian was granted, and protective supervision was granted for a period of nine months. [The respondent] was residing with the boys at the Amethyst House at the time. She was discharged from the Amethyst House on July 28, 2014. During her period of time there, she was noted to have been frustrated with her boys and did not utilize counseling sessions afforded to her to address any of her needs. She chose not to come to a weekly one-on-one session.

"In an attempt to engage her, the Amethyst House consulted with her supervisor for suggestions in engaging [the respondent] in the individual counseling process. After making several attempts, [the respondent] was notified that her failure to attend would be documented. She was reminded that her recovery process needed her input. She appeared to be minimally engaged.

"In late July, allegations arose as to whether [the respondent] was using [a synthetic form of cannabis

known as] K2 and selling K2, as reported by other residents. Amethyst House relied on a drug test to show that [the respondent] had violated [its] house rules by using K2. The result of the test was greatly disputed by [the respondent]. As an immediate result of the report, [the respondent] was told she was on restricted status and could not leave Amethyst House. [The respondent] left Amethyst House without permission, attempting to manipulate the situation. It led to her discharge.

"As a result of her discharge from Amethyst House, she had nowhere to go and her boys became homeless, and a second order of temporary custody was issued. On July 31, 2014, a neglect petition was filed on behalf of Jeremiah, and orders of temporary custody were issued on behalf of both boys. Those orders for temporary custody were subsequently sustained, and on August 29, 2014, Jeremiah was adjudicated neglected.[6]

"On September 22, 2014, [the respondent] had secured supportive housing through the Thames River Family Program in Norwich. The court returned both boys to [the respondent], subject to six months of protective supervision, which was subsequently extended to June 19, 2015.

"During this period of time [the respondent] was expected to cooperate with individual counseling . . . [and] with substance abuse treatment and testing, to not use any drugs unless prescribed, to get and maintain an adequate home and a legal income, to cooperate with any restraining order, and, when the boys were not in her care, to visit as often as permitted." (Footnotes added.)

The court went on to address the respondent's compliance with her specific steps for mental health and substance abuse treatment. The court stated: "With respect to the individual counseling component, [the respondent] was referred or engaged in individual counseling with several different services. She was addressing her post-traumatic stress disorder and anxiety issues with the United Community Family Services. As noted, she entered the Wellmore Behavioral Health Program at the time Damian was removed from her care for inpatient treatment. That individual counseling was continued through the Amethyst House and, as noted, [the respondent] was not fully cooperative and engaged with that counseling.

"[The respondent] was referred to the Women and Family Center for trauma focused services in New Haven on March 4, 2014. On April 22, 2014, [the respondent] advised the department that she had left it as she did not see a benefit and was planning on leaving the area. As noted, [the respondent] was unsuccessfully discharged from Amethyst House in late July, 2014. She relocated to a shelter in New London and reported that she was going to counseling at Connecticut Behavioral

Health Associates.

"In November, 2014, [the respondent] indicated that she had located housing in Norwich and was having difficulty getting to New London for her counseling sessions. [The respondent] was referred to the United Community Family Services or the Connecticut Behavioral Health Associates in Norwich. From November, 2014, until January, 2015, [the respondent] was not involved in those services.

"[The respondent] did an intake for a dual diagnosis program in January, 2015, at the Southern New England Mental Health Authority and only reported one time between then and late March, 2015.

"This case took a dramatic change in April, 2015. [The respondent] was residing in supportive housing with her sons. In early April, 2015, without notice to the [department], [the respondent] gave temporary custody of her sons to [Juan G.] and went to Maine. [The respondent] was arrested on April 13, 2015, on serious charges related to the sale of narcotics. As a result of this arrest, [the respondent] was incarcerated, sentenced, and imprisoned in Maine from April, 2015, until April, 2016.

"[The respondent] did not immediately notify the department of her plans and her placement of her sons with [Juan G.].[7] A third order of temporary custody for Damian and a second order of temporary custody for Jeremiah was issued following the department learning of [the respondent's] arrest and incarceration.

"[These orders] of temporary custody [were] issued on April 17, 2015. The boys have remained in the care of the department since that date. Both boys were committed to the department on July 7, 2015, and have remained committed ever since.

"Specific steps had been in place since 2013, as noted. [The respondent's] attorney negotiated new steps for [the respondent] while [she was] incarcerated, including that she engage in regular or frequent individual therapy until successful completion, and that she cooperate with [the department's] recommended services while incarcerated, including substance abuse services, mental health services, and parenting programs.[8]

"[The respondent], to her credit, attended and participated in multiple programs while [she was] incarcerated and submitted a number of certificates of completion. [The respondent] claimed that these were all the programs that were available to her, and the court has no reason to believe otherwise.

"While [the respondent] was incarcerated, [Juan G.] came back into the picture and asked for reunification efforts and moved to revoke the commitments. Substantial efforts at reunification with [Juan G.] were made, all of which were supported by [the respondent] from

her incarceration in Maine. These efforts continued following [the respondent's] discharge from incarceration in April, 2016, again, with [the respondent's] support.

"Unfortunately for the boys and [Juan G.], [Juan G.] was arrested and incarcerated as a result of serious charges completely unrelated to [the respondent], and subsequently consented to the termination of his parental rights . . . .

"While [the respondent] has been back in the community since April of 2016, she has complied with some steps and not fully with others. [The respondent] has engaged in mental health counseling and has visited faithfully with her boys. She had little or no bond with Jeremiah, but has reengaged with him. Her boys care for her. She deeply cares for them.

"Unfortunately, as [Emily Kavanaugh, a social worker who is employed by Kids Advocates and provides supervised visitation and parenting and education skills] reported, [the respondent] appears overwhelmed and teary when the boys misbehave, and [the respondent] appears to be] unable to meet their needs. . . . Kavanaugh has repeatedly recommended that structure be provided, particularly because of these boys and their needs.

"Both boys have developmental delays, Damian's the most serious of all. Damian may be diagnosed with autism spectrum disorder; there is a suggestion of that. His behavior is difficult to manage, he has trouble with transition, and he is clearly developmentally delayed. Jeremiah demonstrates developmental delay and is a very high-energy, difficult to control young man.

"Kavanaugh testified that, and the court finds credible her claim, that structure and limit setting by [the respondent] do not go well; that both boys have significant developmental delays; that [the respondent] can get it in the moment, but does not seem able to absorb and retain and use developmentally appropriate toys, games, discipline, or limit setting. Ultimately, [Kavanaugh] felt that discipline and limit setting were a great challenge for [the respondent] and that [the respondent] would shut down and not follow through.

"[The respondent] advised the department that she had obtained a job working in landscaping and that she also had social security disability benefits. The department could not confirm the landscaping job. [The respondent] did not provide proof of income on that score, nor was the department able to discern whether the under-the-table income would result in [the respondent] losing her social security disability benefits or being exposed to criminal possibilities.

"So it is unclear whether [the respondent] has an appropriate or sufficient legal income. What was clear is [the respondent] did not have . . . appropriate or sufficient housing. [The respondent] was living in one

room of a rooming house and would not let the department inspect it. She acknowledged that it was not a resource for the boys and saw no reason for [the department] to inspect her surroundings. [The respondent] obtained an apartment immediately before the commencement of the trial in November of 2016.

"[Damian] has been essentially out of [the respondent's] care from November of 2013 to date . . . Jeremiah had been out of [the respondent's] care for a substantial part of his life, and [the respondent] had demonstrated difficulty in controlling her son[s].

"The most disturbing episode [involving the respondent's care of her children] was the report that at a supervised community visit held at the Groton Public Library, which shares a large, busy parking lot with the Groton Senior Center, [the respondent] allowed Jeremiah to walk through the parking lot at age two without holding his hand, and had to be advised by the supervisor of the safety risk. There were several other concerns of [the respondent] being unable to recognize or appreciate safety risk to the boys, that being the most concerning one.

"Another concern was [the respondent's] involvement with [Juan G.]. [Juan G.] has a substantial criminal history, and . . . when [the respondent] was discharged from prison in Maine, while she did not return to a shared residence with [Juan G.], she advised [the department] that she may be moving to Florida with him to help him in his recovery, which would certainly indicate that [the respondent] had not gained insight from her domestic violence classes that she took while in prison, putting [Juan G.'s] needs over her own and her sons' needs.

"A great deal of discussion in the trial, and evidence and questioning, addressed whether the department had properly notified [the respondent] that she needed to address her long-standing mental health issues and be successfully discharged from counseling, whether the parenting and visitation program was appropriate because they—the nature of the shared information or one-on-one counseling—hands-on counseling, and other questions that were raised. All of these questions went to the reasonableness of the services that the department provided.

"The department's obligation is to provide reasonable services, not all possible services. These issues were not raised by any motion in court or any request for a change. They were raised as a challenge after-the-fact and after negative reports had been received.

"So, in sum, we have two boys, the older of whom was removed three times from [the respondent] for issues rooted in her long-standing substance abuse history and her victimization and domestic violence history. The younger one was removed two times for the

same sorts of issues.

"[The respondent] wound up incarcerated for a year for serious drug charges, which she alleges occurred after a year and one-half of sobriety. [The respondent] did not obtain a verifiable income, she did not obtain, on a timely basis, reasonable housing, she did not demonstrate an ability to understand or to meet the particular and significant developmental needs of her sons.

"Accordingly, the [petitioner] has proven by clear and convincing evidence that reasonable efforts to reunify were made with [the respondent]; that she was unable or unwilling to benefit from those efforts; that she failed to meet her specific steps, particularly by gaining adequate housing, benefiting from parenting education, gaining insight into domestic violence and, most significantly, by not getting involved with the criminal justice system.

"So, the court finds that . . . [the respondent's] one year of incarceration . . . seriously impacted and impeded her ability to take a responsible position in the lives of her sons, [and] that each of her sons has significant developmental delays, Damian's more significant than Jeremiah's, but each of consequence.

"[The respondent] has not demonstrated the ability to provide them the necessary structure, and this after a substantial amount of parenting education and support. Each child has special needs. They both require a consistent, structured home. [The respondent], in supervised parenting education, appears overwhelmed and will shut down at times, and is unable to meet her sons' needs on a consistent basis. As noted, the boys have been in care for a long time and are doing well in care. Neither transitions well. Both have been back and forth with [the respondent]: Jeremiah since birth, Damian beginning at one year of age.

"This court knows that [the respondent] loves her children and there is a disparity between a parent's love for her children and her ability to provide them with the nurturing care to which they are entitled. This disparity is clearly demonstrated and rooted in [the respondent's] own untreated trauma history and her longstanding history of substance abuse.

"[The respondent] is making an admirable attempt to meet her own needs, but the court is not encouraged in the belief that within a reasonable period of time, given the special needs of her sons for structure and permanent consistent care, that [the respondent] will ever be able to hold a responsible position in the lives of her boys other than as a possible visitation resource.

"Dispositionally, the court has considered the seven statutory findings and will be making its findings in writing on the Judicial Branch approved form.

"As noted, like all children, the best interest[s] of

these boys requires placement in a home that will foster their interest[s] in sustained growth, development, well-being, and in the continuity and stability of their environment. They have been provided that in their foster home.

"There was a dispute as to whether the foster parents were willing to adopt or not, but the court finds that the foster parents are committed to being a long-term resource for the boys and a likely adoptive resource. In either event, the foster parents will provide the permanency, stability, and continuity that the boys need.

"[The respondent] has not demonstrated the ability to set limits and provide the necessary structure that the boys need in light of their serious developmental delays. [The respondent] has not shown the ability to absorb insights from her domestic violence counseling and her parenting education. [The respondent] has not demonstrated the ability to maintain an adequate income and an adequate home.

"Most significantly, the court believes that if [the children were to be] returned to [the respondent], she would become overwhelmed. The boys' needs would not be met. They would regress and, in all likelihood, return to the department's care, all to their detriment. They need continued consistent stability and will not get that in . . . [the respondent's] care.

"The attorney for the boys supports termination of parental rights and freeing the boys for adoption; and the court finds by clear and convincing evidence that it is in their best interest[s]. All findings in this decision were made by clear and convincing evidence.

"Wherefore, after due consideration of Damian's and Jeremiah's respective needs for a secure, permanent placement with the appropriate structure and follow through to meet their special needs, and considering the totality of the circumstances, and having considered all statutory criteria, and having found by clear and convincing evidence that efforts to reunify with [the respondent] were made and that she was unable or unwilling to benefit from those efforts, and that grounds exist to terminate [the respondent's] parental rights for her failure to rehabilitate, as alleged, and that it is in the best interest[s] of the boys to do so, the court orders that the parental rights of the respondent . . . are hereby terminated as to her children, Damian . . . born [in] September . . . 2011, and Jeremiah . . . born [in] January . . . 2014; [Juan G.'s] parental rights having been previously terminated based upon his consent.

"The [petitioner] is appointed statutory parent for both children for the purpose of securing the children's adoption, with first consideration to be given to the current foster parents." (Footnotes added.)

The court set forth written findings as required by

General Statutes § 17a-112 (k). In addition to making findings concerning the ages of Damian and Jeremiah, the court found: "[The respondent] was offered timely services, including: substance abuse evaluation, testing, and treatment; supportive housing; individual and group therapy; parenting education; visitation; and transportation. . . . [The department] made reasonable efforts [to reunite the family]. . . . [Specific steps] were issued on December 18, 2013, and July 21, 2015. [The respondent] did not consistently follow through with individual counseling. She cooperated with parenting education and domestic violence programs, but did not fully benefit. [The respondent] tested negative for drugs for a significant period of time, but undermined everything by an April, 2015 arrest and one year incarceration on drug charges in Maine. . . . The boys are bonded closely with their foster parents, and have a bond with [the respondent]. Unfortunately, [the respondent] has not demonstrated the ability to provide the structure necessary to give these developmentally delayed boys the consistency and stability they need. . . . [The respondent] made efforts to adjust her circumstances, but did not demonstrate the ability to obtain long-term stable family housing or a consistent, adequate income. She visits faithfully, but has trouble absorbing, retaining, or implementing her parenting education. She tests negative for illicit substances, but was incarcerated for one year (April, 2015–April, 2016) on drug charges in Maine, seriously compromising her ability to maintain contact with her sons. . . . [It had not been shown that the respondent was prevented from maintaining a meaningful relationship with her sons]. [The respondent] was in a mutually harmful domestic violence arrangement with [Juan G.], but her hopes for reunification were kept active by him while she was incarcerated."

We will discuss the court's findings in greater detail in the context of the claims raised by the respondent in the present appeal.[9]

I

First, the respondent claims that the court erroneously found that she failed to rehabilitate. We disagree.

The parties argue, and we agree, that this court reviews the challenged finding under the clearly erroneous standard. "Our Supreme Court has clarified that [a] conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ulti-

mate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . .

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [that the parent has] achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. . . . As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of neglect, substance abuse and criminal activity." (Citations omitted; internal quotation marks omitted.) *In re Savannah Y.*, 172 Conn. App. 266, 275–76, 158 A.3d 864, cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017).

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems." (Citation omitted; internal quotation marks omitted.) *In re Leilah W.*, 166 Conn. App. 48, 67, 141 A.3d 1000 (2016). "In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001). "In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis omitted; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

In challenging the court's adjudicatory finding that she failed to rehabilitate, the respondent isolates four specific subordinate findings set forth in the court's lengthy decision and argues that the findings are clearly erroneous and, thus, warrant reversal of the court's decision. We will address each finding, in turn.

A

The respondent argues that the court's finding that she had not gained insight regarding issues of domestic violence is clearly erroneous. As set forth previously, the court found in relevant part: "Another concern was [the respondent's] involvement with [Juan G.]. [Juan G.] has a substantial criminal history and, as noted, when [the respondent] was discharged from prison in Maine, while she did not return to a shared residence with [Juan G.], she advised [the department] that she may be moving to Florida with him to help him in his recovery, which would certainly indicate that [the respondent] had not gained insight from her domestic violence classes that she took while in prison, putting [Juan G.'s] needs over her own and her sons' needs."

The respondent argues that the court's finding is erroneous because "[t]he only evidence on which the court relied, or could have relied" was a department narrative report, which was an exhibit at trial. The report, generated by a department social worker, Christina Little, states in relevant part that, on April 28, 2016, Little and the respondent discussed Juan G., the fact that the department "[was] not of the belief that [Juan G.] can parent," and the department's concerns as to whether he could make the changes necessary to meet the children's needs. The report also states: "[Social worker] and [the respondent] talked about the plan to move to Florida, which [the respondent] does not want to do but if it would make it easier for [Juan G.], she will do it. [Social worker] explained that her relocation would not change [the department's] position because she is not the only barrier. [Social worker] did note that [the respondent] would need to engage in services wherever she lived and [social worker] can assist better if she is in the area, as we are all familiar with services. [The respondent] stated that she would engage in [treatment] as recommended."

The respondent argues that this evidence, which demonstrated that she had suggested moving to Florida, in no way supported the court's finding that she had contemplated moving to Florida *with* Juan G. or *to be with* Juan G. in Florida. Rather, the respondent argues that this evidence supported a finding that the respondent had contemplated moving to Florida, *to live apart from Juan G.*, if their being apart would assist in Juan G.'s recovery efforts and, thereby, assist him in his efforts to be reunited with the parties' children.

To the extent that the court appears to have interpre-

ted this narrative report to suggest that the respondent had contemplated moving to Florida with Juan G., such an interpretation was not supported by the evidence. We are cognizant of what the report states and the fact that there was no other evidence to suggest that Juan G. planned on relocating in Florida. However, there is no indication that the report was the *only* evidence on which the court relied in finding that the respondent had not gained insight into domestic violence and, specifically, her relationship with Juan G.

As set forth previously in this opinion, the relationship was marked by a history of serious domestic violence, and a violent episode led to Juan G.'s incarceration in 2013.[10] The respondent argues that it is reasonable to interpret the report at issue as evidence that she contemplated moving to Florida and, thus, living far from Juan G., because she believed that doing so would benefit Juan G. Such a contemplated move, however, reflects that the respondent was willing to make a major decision, one that unquestionably would affect her relationship with her children, solely to benefit Juan G., and that, despite his violent history, the respondent favored his having a continued relationship with his children and, perhaps, custody of them. Indeed, as the court found, the respondent supported Juan G.'s reunification efforts while she was incarcerated. It is not surprising, then, that the narrative report reflects the respondent's belief that Juan G. was "doing better than he ever has" and that neither she nor Juan G. was willing to give up their rights with respect to the children.[11]

There was evidence that the respondent made statements to service providers that she and Juan G. essentially were no longer in a relationship. Yet, there was concerning and undisputed evidence presented at trial that contradicted these representations.[12] The court in its fact-finding role reasonably could have determined that the statements made by the respondent concerning Juan G. were self-serving and that the respondent's conduct and her expressed hopes for Juan G. and his continued relationship with the parties' children undermined a belief that the respondent had gained valuable insight into her relationship with Juan G. and the dangers that his violent, criminal history posed to her and her children.

### B

The respondent argues that the court's finding with respect to her legal income and her housing was not supported by the evidence. It is undisputed that, among the specific reunification steps was that the respondent "[g]et and/or maintain adequate housing and a legal income." As set forth previously in this opinion, the court made the following relevant finding: "[The respondent] advised the department that she had obtained a job working in landscaping and that she also had social

security disability benefits. The department could not confirm the landscaping job. [The respondent] did not provide proof of income on that score, nor was the department able to discern whether the under-the-table income would result in [the respondent] losing her social security disability benefits or being exposed to criminal possibilities.

"So it is unclear whether [the respondent] has an appropriate or sufficient legal income. What was clear is [the respondent] did not have an appropriate or sufficient housing. [The respondent] was living in one room of a rooming house and would not let the department inspect it. She acknowledged that it was not a resource for the boys and saw no reason for [the department] to inspect her surroundings. [The respondent] obtained an apartment immediately before the commencement of the trial in November of 2016."

At trial, department social worker Christina Little testified with respect to the fact that she had visited a two bedroom apartment that the respondent began to lease in November, 2016, during the pendency of the trial. She stated that the respondent represented that she was obtaining "legal income" in the form of social security disability benefits, which benefits were related to her mental health, since childhood. Additionally, Little testified that, according to the respondent, since the summer months, the respondent was obtaining a portion of her income, approximately $200 to $300 per month, from seasonal landscaping work for which she was being paid "under the table." Little testified that she did not have the ability to verify the landscaping income because the respondent did not receive pay stubs, but that, according to the respondent, her income that resulted from both sources was adequate for her needs. Little testified that she understood the landscaping income to be inconsistent in that it was dependent on her employer's seasonal needs, such as a need for snow removal work during the winter months. During Little's examination at trial, the court questioned whether the respondent's social security disability benefits were contingent on her being unable to work and, thus, whether her landscaping work might jeopardize her right to continue to receive such benefits. As the court recognized, Little was unable to shed any light on this issue.

With respect to housing, there was evidence that, after she returned to Connecticut from her incarceration in Maine, the respondent lived in a boarding house that was insufficient for her children. Later, in November, 2016, the respondent leased a two bedroom apartment. There was no evidence that the two bedroom apartment was, at least in the department's assessment, inadequate. Little testified that the apartment was a month-to-month lease, that there were no safety concerns visible to her, and that the apartment appeared

to be spacious, freshly painted, and clean.

The court's finding with respect to income was supported by the evidence. There was evidence that, in the months prior to trial, the respondent was receiving income that she believed to be adequate to meet her needs from her receipt of benefits and her earnings from a landscaping job. This evidence came in the form of the respondent's representations to Little, which the court reasonably could have viewed to be self-serving, not in the form of verifiable documentation of earnings or benefits. Yet, setting aside concerns that the department was unable to verify the earnings from the landscaping job, the landscaping income was, in terms of Little's observations, not a dependable source of income because it was based on her employer's seasonal need for workers.[13] In light of the foregoing, the evidence supported a finding that it was simply not clear whether the respondent had, or could maintain, adequate or sufficient income.

The respondent claims that, in light of the undisputed evidence that the respondent leased an apartment in November, 2016, and that Little did not have any objections to it, the court's finding that "[the respondent] did not have an appropriate or sufficient housing" was clearly erroneous. The court discussed the respondent's history of inadequate housing. It did not disregard the evidence that the respondent obtained an apartment in November, 2016, but made a specific finding in that regard in its decision. The court stated elsewhere in its decision that the respondent failed to obtain housing *on a timely basis*. This finding is supported by the record. The evidence, including Little's testimony, supported a finding that the respondent's newly leased apartment was sufficient. Such evidence, however, did not support a finding that the respondent, who had a lengthy history of being unable consistently to maintain housing and income, was able to maintain such apartment for her children and, for the reasons set forth above, whether she could maintain the income necessary to do so.

As we previously have discussed in this opinion, the court found that from the date that the respondent's children were committed to the department's care on December 18, 2013, the respondent exhibited a pattern of failing to maintain stable housing. On April 1, 2014, the respondent was permitted to reside with her children at Amethyst House, but, on July 28, 2014, after she left Amethyst House without permission to do so and was suspected to have used K2, she was discharged from Amethyst House. Due to the respondent's homelessness, the petitioner sought orders of temporary custody, which the court granted on behalf of both of the respondent's children. On September 22, 2014, the respondent obtained supportive housing through the Thames River Family Program in Norwich. The court

returned both of the respondent's children to her subject to protective supervision. The respondent, however, voluntarily surrendered her supportive housing program when she left to sell narcotics illegally in Maine and placed her children with Juan G. without notifying the department. The respondent's criminal conduct resulted in her inability to regain any stable housing due to her year long incarceration that commenced in April, 2015, during which time the termination of parental rights petition was filed. Upon the respondent's release from incarceration in April, 2016, she managed to find shelter in a rooming house, which she admitted was not adequate family housing. Only in early November, 2016, after the trial had commenced, did the respondent obtain the newly leased apartment at issue.[14]

It was in this factual context that the court found that the respondent did not obtain or maintain adequate housing for herself and her children on a timely basis. The fact that the respondent only obtained the housing during the pendency of the trial, and that the evidence reflected her historic inability to maintain adequate housing for herself and her children, for an appreciable length of time, amply supports the court's finding that she failed to demonstrate an ability to maintain housing that was adequate for her family's needs.

As we have stated previously in this opinion, personal rehabilitation does not require that the respondent demonstrate precisely when she will assume a responsible position in the lives of her children or that she will be able to do so unaided by support systems. *In re Leilah W.*, supra, 166 Conn. App. 67. Section 17a-112 (j) (3) (B) (i) provides for the termination of parental rights where the child "has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." "[P]ersonal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reason-

ably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Internal quotation marks omitted.) *In re Paul M.*, 154 Conn. App. 488, 495–96, 107 A.3d 552 (2014).

The evidence permitted the court to find that the respondent's long-term dysfunction as a parent required more than a showing that she had leased an apartment for one month, and that the respondent's children, in light of the amount of time they had spent in foster care and their special needs, should not be required to wait any longer in an attempt to ascertain whether the respondent finally would be able to maintain adequate housing or otherwise rehabilitate. There was an ample evidentiary basis to support the court's finding by clear and convincing evidence that the respondent's level of rehabilitation fell short and that the children's need for permanency and stability ultimately should prevail.

C

The respondent argues that the court's finding that neither of her children "transitions well" is clearly erroneous. Although the court did not elaborate on this finding, we interpret the court's finding to refer to the ability of the children to respond in an age appropriate manner to life changes and, in particular, changes related to being in the respondent's care. The respondent correctly acknowledges that Little unambiguously testified that "[t]ransitions were especially difficult for [Damian]." The respondent, however, argues that there was no such evidence concerning Jeremiah, who was described by Little as not demonstrating major behavioral issues.

Although the respondent focuses on Little's assessment of Jeremiah, there was relevant evidence from Kavanaugh, a social worker who supervised visits between the respondent and her children in 2016. Kavanaugh testified that Jeremiah was "high-energy" and "more impulsive" than his brother. Kavanaugh testified that Jeremiah has speech delays and was receiving care in a "Birth to Three" program to address those delays. Kavanaugh testified that both brothers had behavioral and speech delay issues. Kavanaugh testified that both brothers had special needs with regard to structure.

In Kavanaugh's case notes, which were admitted as exhibits at trial, she expressed her concern that, during her supervised visits with the respondent and her children, Jeremiah exhibited confusion over Kavanaugh's identity by referring to her as "daddy." Kavanaugh viewed this behavior as being indicative of "attachment disruption in early childhood stages, which is of great concern for Jeremiah's emotional stability." Additionally, Kavanaugh observed that Jeremiah "seem[ed] to be unsure at times with [the respondent], and her role in his life." In another report, Kavanaugh observed that Jeremiah "refused a hug from [the respondent], and

does not seem to identify with her as his mother."

In light of the foregoing, it was not contrary to the evidence for the court to find that Jeremiah had difficulty with transitions.

D

The respondent argues that the court's finding that she was unable to benefit from parenting education is clearly erroneous. The respondent recognizes that, in making this finding, the court relied on a great deal of evidence that was presented at trial, including Kavanaugh's observations during supervised visits between the respondent and the children. In its decision, the court referred generally to its concern that the respondent was unable to recognize or appreciate safety risks involving the children and noted one particular incident that occurred in the parking lot of the Groton Public Library during which the respondent permitted Jeremiah to walk through the busy parking lot without holding his hand. The respondent argues that the court placed undue weight on this "insignificant" safety incident.

In our review of the respondent's claim, it is apparent that the respondent does not dispute that there was evidence, particularly in the form of Kavanaugh's testimony and reports in evidence, from which the court could have found that parenting deficiencies existed. Nonetheless, the respondent invites this court to reevaluate the evidence and conclude that a factual mistake was made by the trial court. The respondent, while recognizing that parenting inadequacies continued to exist at the time of trial, urges us to conclude that the evidence reflected that the respondent showed improvement in her parenting skills and that she was able to absorb insights from her parenting education.

As the court detailed, the respondent previously received parenting education from a variety of providers since 2012. Reports from Kavanaugh's supervised visits during 2016, however, reflected a variety of concerns related to the respondent's parenting skills. These reports reflect repeated instances when the respondent failed to appreciate safety risks pertaining to the children, failed or was unable to exercise authority to control the children, and failed to implement necessary parenting strategies. Kavanaugh reported that the respondent became emotional and "overwhelmed" at times, leading Kavanaugh to conclude that the respondent was "shutting down" instead of acting like a responsible parent. Additionally, Kavanaugh testified that, in light of the children's special needs, she attempted to educate the respondent about the nurturing of cognitive development in her children, but there was reason to doubt that the respondent had demonstrated marked improvement in this regard. She testified that, in successive visits, she found herself

repeatedly redirecting the respondent's behavior with respect to the children.

Although the respondent attempts to downplay the lapses in her parenting skills, there was evidence before the court that the lapses were related to basic skills of parenting that are necessary to provide structure in the children's lives. Following several supervised visits up until the time of trial, Kavanaugh opined that "it appeared that [the respondent] lacked insight into what her role could be in providing the structure for them . . . these are basic skills. It might seem like it's not a big deal, but when you're talking about children who have had attachment disruption and children that have these significant delays, structure is everything. That's safety for them. So mealtime, naptime, limit setting is imperative for them to feel safe."

We have reviewed the relevant evidence and conclude that the court's finding is supported by the evidence and, with due regard for the services provided to the respondent by the department and the several parenting deficiencies that were brought to the court's attention, we are not persuaded that a mistake occurred. We are mindful that § 17a-112 "requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Although the record reflects that the respondent may have rehabilitated to some extent during the course of the department's involvement with her since 2012, the evidence supported a finding that the extent of the deficiencies that continued to exist at the time of trial reflected that the respondent was unable to benefit from continued parenting education.

E

We have rejected most of the arguments made by the respondent with respect to the subordinate factual findings at issue. To the extent that we have determined that the court appears to have erroneously interpreted one of Little's reports in its assessment of the respondent's insight into issues of domestic violence, we are not persuaded that the error undermines the court's findings as a whole. The respondent argues that the "mosaic" doctrine that applies in dissolution cases; see, e.g., *Grant* v. *Grant*, 171 Conn. App. 851, 869, 158 A.3d 419 (2017) (issues involving financial orders are entirely interwoven, rendering of judgment in complicated dissolution case is carefully crafted mosaic, and each element of court's judgment may be dependent on another); should govern. Thus, the respondent urges us to conclude that the claimed errors, or any degree of error, should cause us to set aside the trial court's

overall factual conclusion that rehabilitation failed.[15] The respondent argues that "[t]here is no way to know what the trial court would have decided about any facet of [the respondent's] relationship with her children had it not mistakenly concluded that she had no adequate income, had no adequate housing, had not gained insight from domestic violence counseling, intended to put [Juan G.'s] needs before the children's and that the children had difficulty with transitions." The respondent recognizes, however, that the application of this type of "all or nothing" doctrine with respect to erroneous factual findings in termination of parental rights cases does not find support in our case law. Rather, as this court has observed: "Where . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *In re Selena O.*, 104 Conn. App. 635, 645, 934 A.2d 860 (2007).

The court made many findings that were relevant to an assessment of the respondent's ability to parent her children. These findings related to the respondent's history of substance abuse, her criminal behavior that has directly impacted her ability to be a parent, and her poor judgment as reflected in her unstable and, at times, violent relationship with Juan G. Moreover, the court detailed the respondent's history of failing to provide her children, both of whom have special needs, with an adequate home or care. Additionally, the court made several findings that reflected that the respondent, having had the benefit of parenting counseling, still lacked even the most basic parenting skills. Viewed against this plethora of factual findings, many of which are not in dispute, the respondent has not demonstrated that any of the court's factual findings lacked support in the evidence and, to the extent the court erroneously interpreted a single report in evidence, that this isolated error undermines confidence in the court's adjudicatory findings as a whole.

## II

Next, the respondent argues that the court erroneously found that termination of her parental rights was in the best interests of the children. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of [the respondent's] parental rights is not in the best interests of the child. In arriving at this decision, the court is mandated to consider and [to] make written findings regarding seven factors delineated in [§ 17a-112 (k)].[16] . . . As with the

findings made in the adjudicatory phase, we reverse the court's determination of the best interest of the child only if the court's findings are clearly erroneous.'' (Footnote added; internal quotation marks omitted.) *In re Harlow P.*, 146 Conn. App. 664, 678–79, 78 A.3d 281, cert. denied, 310 Conn. 957, 81 A.3d 1183 (2013).

Initially, the respondent argues that, in light of the errors claimed in part I of this opinion, the court should not have reached the issue of whether termination was in the best interests of the children. Because we have rejected those claims of error, this aspect of the claim is without merit. Alternatively, the respondent argues that because several of the court's subordinate findings of fact in the dispositional phase of the proceeding were clearly erroneous, we should set aside the court's finding that termination was in the best interests of the children. We will address these arguments separately.

A

In relevant part, the court found that "if returned to [the respondent], she would become overwhelmed. The boys' needs would not be met. They would regress and, in all likelihood, return to the department's care, all to their detriment. They need continued consistent stability and will not get that in . . . [the respondent's] care." The respondent argues that this finding "is clearly erroneous and cannot withstand meaningful scrutiny as it finds no basis in the record. The department offered no evidence concerning any emotional or developmental regression by Damian or Jeremiah upon return to [the respondent's] care. The petitioner offered no evidence that the boys acted any differently upon returning to foster care after the first or second removal, nor was there any evidence that Damian and Jeremiah had a hard time adjusting or readjusting after visits with [the respondent].

"While there was evidence, that, since being placed in foster care, the boys have progressed developmentally, there was *no evidence* that either child regressed as a result of any event or circumstance since the department's involvement." (Emphasis in original.)

The respondent appears to disregard the plain language of the finding she challenges. The court did not state that there was evidence that the children had regressed emotionally or developmentally upon returning to the respondent's care. Instead, the court expressed its belief that *if the children were reunited with the respondent* it was likely that they would regress. The court did not express this belief in a factual vacuum; its decision reflects its emphasis on the respondent's historical dysfunction as a parent and a law abiding citizen as well as the evidence that the respondent continued to lack basic parenting skills. The court stated its belief that, if the children were reunited with the respondent, she would become overwhelmed, she

would not meet their needs adequately, and the respondent would not provide them with the consistent stability that their unique developmental challenges require. There was evidence that the respondent had a history of becoming overwhelmed when presented with the children's behavioral issues. There was ample evidence that, despite the department's efforts, at the time of trial, the respondent still was unable to meet the children's basic needs adequately. In light of the fact that the respondent was unable to demonstrate an ability to maintain an adequate income and housing, let alone to foster cognitive development in two children with special needs, there was ample evidence for the court to find that the respondent was unable to provide the children with consistent stability. In light of the number of times the children had been removed from the respondent's care, it would not have been unreasonable for the court to have had great concern that another unsuccessful reunification likely would have had devastating consequences for the children. The court reasonably could have inferred from the evidence and its other findings of fact that reunification with the respondent likely would have led the children to regress in terms of their emotional and developmental progress.

B

The respondent challenges the court's dispositional finding on the ground that it erroneously found (1) that she was unable to absorb insights from her domestic violence counseling, (2) that she was unable to maintain adequate income or housing, and (3) that she was unable to absorb insights from her parenting education. The respondent acknowledges that these arguments previously were raised in substance in the context of her first claim, and we rejected these factual claims on their merits in parts I A, I B, and I D, respectively. Accordingly, these aspects of the present claim do not support the claim.

C

As she did in the context of her challenge to the court's adjudicatory finding, the respondent argues that, in light of the court's erroneous fact findings in the dispositional phase of the proceeding, reversal of the court's dispositional finding is required as a matter of law. Although the respondent urges us to conclude that any factual error requires reversal under the type of "mosaic" doctrine that applies in dissolution cases; see, e.g., *Grant* v. *Grant*, supra, 171 Conn. App. 869; we reiterate that that doctrine has not been applied in termination cases. Nor is such an approach appropriate under the statutory framework or our case law. See, e.g., *In re Selena O.*, supra, 104 Conn. App. 645. Alternatively, the respondent argues that reversal is required because, in light of the claimed factual errors, this court should be left with the firm conviction that a mistake was made in the dispositional phase of the proceeding.

The respondent has failed to demonstrate that any of the court's findings were clearly erroneous. The court's best interest determination rests on a variety of findings, several of which are not challenged on appeal. We are mindful that "[an appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Sole S.*, 119 Conn. App. 187, 191, 986 A.2d 351 (2010). Because we disagree that any of the court's factual findings were clearly erroneous, as claimed by the respondent, we are not left with the conviction that the court's finding that termination was in the best interests of the children should be disturbed.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** November 16, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts . . . to reunify the child with the parent in accordance with subsection (a) of section 17a-111b . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." Although § 17a-112 (j) (3) (B) has been the subject of technical amendments in 2015; see Public Acts 2015, No. 15-159, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] "Pursuant to § 17a-112 (j), the trial court must make certain required findings after a hearing before it may terminate a party's parental rights. It is well established that, [u]nder § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3) exist] by clear and convincing evidence. . . . In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. . . . Section [17a-112 (j) (3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Oreoluwa O.*, 321 Conn. 523, 531–32, 139 A.3d 674 (2016).

[3] The court delivered its decision orally and later, in compliance with Practice Book § 64-1 (a), signed a transcript of its decision for use in the appeal.

[4] On April 13, 2012, the petitioner filed a petition, pursuant to General

Statutes § 46b-129, alleging that Damian was a neglected child. On June 19, 2012, Damian was adjudicated neglected and allowed to remain in the care of the respondent, subject to an order of protective supervision, until December 19, 2012. That order was extended to March 19, 2013, when it was allowed to expire.

[5] In relevant part, these steps required that the respondent keep all appointments with the department; that she advise the department of her and her children's whereabouts at all times; that she submit to a substance abuse evaluation; that she not use illegal drugs or abuse alcohol or medicine; that she cooperate with court ordered evaluations or testing; that she "[g]et and/or maintain adequate housing and a legal income," that she avoid domestic violence incidents; that she not get involved with the criminal justice system.

[6] The court approved specific steps for the respondent as part of its disposition. In relevant part, these steps included that the respondent keep all appointments set by or with the department; that she advise the department of her and her children's whereabouts; that she take part in parenting and individual therapy until successful completion; that she submit to substance abuse evaluation and follow treatment recommendations; that she submit to random drug testing; that she engage in individual therapy, methadone/suboxone maintenance as recommended; that she engage in substance abuse treatment as recommended; that she cooperate with court ordered evaluations or testing; that she "[g]et and/or maintain adequate housing and a legal income; that she attend and complete an appropriate domestic violence program; and that she not get involved with the criminal justice system.

[7] As noted previously, one of the respondent's specific steps was that she keep the department notified of her and her children's whereabouts at all times. See footnotes 5 and 6 of this opinion.

[8] In relevant part, these steps included that the respondent submit to substance abuse evaluation and follow treatment recommendations; that she submit to random drug testing; that she cooperate with service providers and engage in individual therapy, methadone/suboxone maintenance as recommended, substance abuse services, mental health services, and parenting programs; that she attend any available domestic violence programs available to her during her incarceration; that she not get involved with the criminal justice system; and that she provide information to the department about possible placements for her children.

[9] Counsel for the children has submitted a position statement that supports the brief filed by the petitioner.

[10] A social study in support of the termination of parental rights, which was submitted to the court as an exhibit, provides in relevant part that Juan G. "has an extensive criminal history, including the following charges: third degree robbery, multiple larceny charges, multiple assault charges, failure to appear, possession of drugs, burglary, risk of injury and violation of probation." The report also states, in relevant part, that Kavanaugh had concerns about Juan G.'s judgment with respect to whom he would allow access to his children. Specifically, she indicated that, during a visit with Juan G. in February, 2016, he stated "that his best friend and former roommate died from a heroin overdose; this individual was under suspicion for sexually assaulting a child. According to [Juan G.], he would have allowed this person [to be] around his children because he could not believe the allegations."

[11] As we stated previously, however, at the time of the trial, Juan G. did not contest the termination of his parental rights in the parties' children.

[12] Marsha Quinn, a service provider employed at Madonna Place, testified that the respondent had recognized that her relationship with Juan G. had been a mistake, but that, in the summer of 2016, she had a chance encounter with the respondent and Juan G. in a supermarket. Quinn testified that, on this occasion, "they were going [for] a visit."

[13] Although the respondent argues that there was no support in the record for the court's concern that the landscaping work might jeopardize the respondent's entitlement to disability benefits, it certainly was not unreasonable for the court in careful scrutiny of the evidence of the respondent's income to express its concern as to whether a disability benefit might be jeopardized by the respondent's newfound employment.

[14] The court began hearing evidence in the present case on October 17, 2016. Little testified that she visited the respondent's newly leased apartment on November 9, 2016, that the respondent obtained the apartment during the first week of November, 2016, and that her month-to-month lease expired on November 30, 2016.

[15] Alternatively, the respondent argues that, absent the court's erroneous factual findings, "there is insufficient evidence left to support the trial court's conclusion."

[16] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." Although § 17a-112 (k) has been the subject of technical amendments in 2016; see Public Acts 2016, No. 16-28, § 15; Public Acts 2016, No. 16-105, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.