******************************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

IN RE KARTER F.*
(AC 44496)

Alvord, Clark and Sullivan, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial
court terminating his parental rights with respect to his minor child,
K. *Held*:

1. The respondent father could not prevail on his claim that the trial court
improperly found that the Department of Children and Families made
reasonable efforts to reunify him with K and that he was unable or
unwilling to benefit from such efforts.

a. The trial court's finding that the department made reasonable efforts
to reunify the respondent father with K was supported by substantial
evidence and was not clearly erroneous: in light of the circumstances
created by the father, including his incarceration, this court could not
conclude that the department's efforts were unreasonable; the depart-
ment provided the father with the opportunity to visit with K, which
he initially declined, and, once visits were requested, the department
consistently provided them, and the department encouraged the father
to avail himself of services offered by his correctional facility; thus, the
department's efforts were in line with efforts that this court has pre-
viously found to be reasonable.

b. The trial court properly found that the respondent father was unable
or unwilling to benefit from reunification services: the court recognized
that, due to the father's incarceration, which this court has stated is a
relevant and appropriate factor for the trial court to consider, he would
be unavailable to K until his release, K was only four months old at the
time of the father's incarceration and, even assuming that he was paroled
at the earliest possible release date, K would be a five year old child
who has no emotional connection to the father; the court made ample
relevant factual findings, including that the father's incarceration ren-
dered him unable to benefit from reunification efforts, and findings
concerning the father's unresolved mental and emotional issues, his
failure to take advantage of the opportunities that the department offered
to treat those issues, and his failure to bond with K during his incarcera-
tion.

2. The respondent father's claim that the trial court incorrectly concluded
that he failed to rehabilitate pursuant to statute (§ 17a-112 (j) (3) (B)
(i)) was unavailing: although the father claimed that the court failed to
consider the COVID-19 pandemic and the resulting cessation of services
while he was incarcerated, he failed to acknowledge that the relevant
date for considering whether he failed to rehabilitate was the date on
which the petition for termination of parental rights was filed, which,
in the present case, was approximately seven months before the onset
of the COVID-19 pandemic; the father did not fully comply with the
court-ordered specific steps requiring him to complete available mental
health and intimate partner violence treatment and to visit K as often
as permitted by the department, and the trial court properly found that
the father's failure to engage in services and to improve his parenting
skills called into question his ability to take responsibility as a parent
and supported the court's finding that he puts his own needs before
those of K and, thus, the record did not support the belief that the father
could achieve a responsible role in K's life within a reasonable period
of time.

3. The respondent father could not prevail on his claim that the trial court
improperly found that termination of his parental rights was in K's
best interests: the court made findings pursuant to each of the factors
delineated by the applicable statute (§ 17a-112 (k)) and, although the
father claimed that he could still rehabilitate, the trial court correctly
determined that the father would not be able to assume a responsible
position in K's life within a reasonable time; moreover, K's interests in
stability and permanence outweighed the father's interest in the care
and custody of K; furthermore, the father did not make progress in

addressing his issues as required by his specific steps, and K, who was three years and nine months old at the time the court rendered judgment terminating the father's parental rights, had lived with his half brother in the same foster home since he was adjudicated neglected, he had bonded with his foster parents, who hoped to adopt K, as well as with the other children in the home, and expert testimony indicated that removing K from the foster home would be not only disruptive, but traumatic.

Argued May 13—officially released August 24, 2021**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters at Bridgeport, and transferred to the judicial district of New Haven, Juvenile Matters; thereafter, the case was tried to the court, *Conway, J.*; judgment denying the respondent father's motion to revoke commitment and transfer guardianship and terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed*.

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Elizabeth Bannon*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Opinion*

CLARK, J. The respondent father, Charles W. (respondent), appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families (commissioner), terminating his parental rights with respect to his minor child, Karter F., pursuant to General Statutes § 17a-112 (j).[1] On appeal, the respondent claims that in terminating his parental rights, the trial court improperly found that (1) the department made reasonable efforts to reunify him with his child and that he was unable or unwilling to benefit from reunification services, (2) he had failed to rehabilitate, and (3) it was in the best interests of the child to terminate his parental rights. We disagree with the respondent and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant. The child was born in March, 2017. In June, 2017, the respondent was arrested on charges of breach of the peace in the second degree and assault in the third degree after he allegedly punched the mother in the face and spat on her, an incident for which the mother obtained a protective order against him. In July, 2017, the respondent again was arrested and charged with, inter alia, assault in the first degree, risk of injury to a child and carrying a pistol without a permit, in connection with an incident in which he allegedly shot a thirteen year old boy. His bond was set at $1 million and he was incarcerated at the Northern Correctional Institution.

On September 21, 2017, the Department of Children and Families (department) filed neglect petitions on behalf of the minor child and his maternal half brother. On October 10, 2017, the department invoked a ninety-six hour administrative hold on behalf of the child, due to the mother's unaddressed mental health and intimate partner violence issues, lack of stable housing, and the respondent's incarceration.[2] The respondent was given specific steps to facilitate reunification, which were approved and ordered by the court on October 13, 2017. On that same date, an order of temporary custody was filed and granted. The court held a hearing on October 20, 2017, to address the order of temporary custody. On October 26, 2017, the respondent appeared and, through appointed counsel, agreed to the order of temporary custody. The respondent requested a paternity test, which was ordered by the court. During the termination hearing, the court found that "[a]t a January 18, 2018 court hearing, the court and the parties reviewed the results of the paternity test: there existed a 99.99 percent likelihood that [the respondent] was [the child's] father." The respondent initially contested the results of the court-ordered paternity test and requested a contested paternity hearing, which the court scheduled. The respondent, however, elected not to proceed

with the hearing and acknowledged paternity, which the court adjudicated on February 7, 2018.

Also in January, 2018, the child was adjudicated neglected and committed to the care and custody of the commissioner. Final specific steps were ordered for the respondent at the January 18, 2018 hearing, which required the respondent, inter alia, to engage in counseling; cooperate with service providers of mental health treatment, intimate partner violence treatment and education, and parenting services as determined appropriate by the department; attend and complete a domestic violence program; avoid the criminal justice system; and visit the child as often as permitted by the department. A department social worker first contacted the respondent in May, 2018. While he was incarcerated, from September, 2018, to March, 2020, the respondent engaged in monthly one hour supervised visits with the child.[3] Because the respondent was incarcerated, limiting what services the department could provide to him directly, the department encouraged the respondent to utilize services and programs available through the Department of Correction. Those services and programs were paused in 2020, when the COVID-19 pandemic rendered their provision no longer feasible.

On January 15, 2019, following a guilty plea and conviction of the criminal charges stemming from the incident in which the respondent shot a minor, the respondent was sentenced to seven years in prison. He was transferred from Northern Correctional Institution to Cheshire Correctional Institution, where he became eligible for a number of services and programs offered by that facility.

Approximately seven months prior to the start of the COVID-19 pandemic, on August 28, 2019, the commissioner filed a petition to terminate the respondent's parental rights as to the child pursuant to § 17a-112 (j), on the grounds that the child had been adjudicated neglected and the respondent had (1) failed to achieve sufficient personal rehabilitation and (2) lacked an ongoing parent-child relationship. The commissioner alleged that the department had made reasonable efforts to reunify the child with the respondent, but the respondent was unwilling or unable to benefit from the department's efforts because he had not engaged in recommended mental health services or otherwise addressed his issues, was incarcerated, and struggled to engage appropriately with the child during supervised visits, despite having received support and education. The commissioner further alleged that termination of the respondent's parental rights was in the child's best interests because the respondent had not engaged in court-ordered treatment or recommended services, displayed little interest in the child during supervised visits, and was serving a seven year prison sentence. The commissioner alleged that the child was attached to

his foster parents, with whom he had lived, along with his half brother, since October, 2017.

The commissioner appended a social study to the termination petition pursuant to Practice Book § 35a-9, which was admitted into evidence. The study stated that the department encouraged the respondent to "partake in individual counseling services in May, 2018," and referred the respondent "to Integrated Wellness for individual therapy [and] employment assistance" and "mental health counseling with the Interface Center." Despite these referrals, the study stated that, although the respondent began participating in anger management services on January 25, 2019, he "ha[d] not started individual therapy at Cheshire Correctional [Institution] . . . ." The respondent "ha[d] not participated in any therapeutic services to date per his counselor's report." The respondent also "ha[d] not made efforts to utilize the correctional [facility's] books to educate himself on the roles of a father and the importance of engagement with [the child]." The court found that, although the respondent engaged in anger management sessions, prayer groups, and prison employment once he was transferred to Cheshire Correctional Institution, he "has yet to [engage] in meaningful and necessary mental health treatment or [intimate partner violence] treatment."

The study also stated that the respondent declined to request visitation with the child until August, 2018.[4] When visits between the respondent and the child commenced in September, 2018, the respondent "struggle[d] to engage with [the child] . . . [did] not speak to [the child] during his visits and during times [the child was] sad or crie[d], he [did] not attempt to nurture or console him. [The respondent] display[ed] little to no interest in [the child's] well-being during supervised visits and ha[d] limited physical contact with him. For example, [he] . . . [vented] about his life while incarcerated and [did] not ask for updates on [the child's] developmental, medical or social well-being."

The court conducted a termination trial remotely[5] on November 23 and 30, 2020. At trial, Inés Schroeder, a clinical and forensic psychologist, testified that she had performed a court-ordered psychological evaluation of the respondent in January, 2020. Schroeder's evaluation report was admitted into evidence, and revealed that the respondent struggles with anger, as evidenced by his June, 2017 domestic violence arrest, and has difficulty appreciating the needs of the child. When asked if the respondent demonstrated an understanding as to why the child was in foster care, Schroeder testified that the respondent "felt that he had not done anything wrong" and that the child was in the petitioner's care "because [the mother] was unable to take care of him . . . ." Schroeder also testified that she had observed the child and the respondent together. Consistent with

the statements in the study, the child was silent for most of the observed visit and "did not engage playfully and actively until about the last ten minutes of the interaction and he did so at a distance." By contrast, the child was "very animated . . . [and] . . . sought physical affection voluntarily and spontaneously" when he was with his foster parents. The department's social worker also testified that the respondent had not participated in any mental health services while he was incarcerated and that he failed to engage with the child during visits or display an emotional bond with him.

Following the trial, on December 3, 2020, the court issued a memorandum of decision granting the petition on the grounds that the respondent had failed to rehabilitate[6] and that termination was in the child's best interests. The court first found that the department had made reasonable efforts to locate the respondent and to reunify him with the child, but found that the respondent was unable to benefit from those efforts. The court set forth the following factual findings in support of that determination. The respondent has been incarcerated since July, 2017, when the child was four months old, and his sentence runs until 2024, with the earliest possible release date in the fall of 2022. The department provided the respondent with monthly supervised visits with the child, but, due to the respondent's paternity challenge, those visits did not become possible until February, 2018, when the respondent's paternity was adjudicated. The respondent did not request visits with the child until six months later, in August, 2018. The department began to provide visits in September, 2018. After his sentencing in January, 2019, the respondent engaged in anger management sessions, prayer groups, and a work program. The court acknowledged that "the services available to a respondent father housed in [a correctional facility] [are] not as robust as community based services," but, nonetheless, found that the department made reasonable efforts to reunify the respondent with the child, given the monthly visits and referrals to programs offered by Cheshire Correctional Institution. The court also found that, regardless of the reduction in correctional programs due to the COVID-19 pandemic after the termination petition was filed, the respondent's protracted incarceration prevented reunification.

The court next addressed the adjudicatory ground of failure to rehabilitate. Reviewing the respondent's circumstances, the court determined that his "present situation renders him incapable of being a meaningful resource" for the child because his incarceration extended to at least the fall of 2022. The child was four months old when the respondent was incarcerated and, even if the respondent were released on the earliest possible release date, in the fall of 2022, the child would then be five years old and have no emotional connection to the respondent. Even on release, the respondent

would need to reintegrate into the community and engage in "meaningful, beneficial, and direly needed mental health treatment" before he could parent the child. The court credited Schroeder's report extensively in support of this finding, quoting several of her observations. The court highlighted Schroeder's observation that the respondent struggles with depression and exhibits "below average cognitive functioning" and a "limited grasp of social etiquette and expectations." (Internal quotation marks omitted.) The respondent has difficulty managing his feelings, as "[i]ntense anger often yields highly volatile and aggressive actions . . . ." (Internal quotation marks omitted.) Significantly, the respondent disclosed to Schroeder, in discussing the June, 2017 domestic violence incident in which he punched the mother, that "I am very paranoid and if someone gets close, I start swinging. It sets me into this mood and [I] don't see nothing but blackness. I don't recall what I do during the blackness period. I have had that since I was a little kid." (Internal quotation marks omitted.) Schroeder opined that the respondent "struggles to consider his child's needs above his own [and] . . . has limited insight into his child's psychological needs." (Internal quotation marks omitted.) The court, therefore, concluded that the petitioner had proven the adjudicatory ground of failure to rehabilitate under § 17a-112 (j) (3) (B) (i), namely, that the respondent "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [he] could assume a responsible position in the life of the child . . . ." The court found that the respondent's "requisite degree of parental rehabilitation . . . given [the child's] specific needs . . . is simply not foreseeable in a reasonable period of time."

The court proceeded to the dispositional phase of the proceedings, in which it addressed the best interests of the child pursuant to § 17a-112 (k), and made the findings required by that statute by clear and convincing evidence. The court found that, from July, 2017, when the respondent was arrested after shooting a minor, to September, 2018, when visits between the child and the respondent began, there was no contact between the respondent and the child. From September, 2018 to March, 2020, the respondent "was a once a month, one hour presence in [the child's] life," because, due to his incarceration, the department could only provide monthly supervised prison visits. During these visits, the respondent "squander[ed] his parenting time . . . ."

The court found that, while he was incarcerated, the respondent showed no interest in involving himself in the child's life, and his behavior was consistent with Schroeder's observations that he put his own needs over those of the child. The court considered the respondent's behavior at visits, his lack of attempts to

connect with the child outside of visits apart from mailing him one birthday card in 2020, and his paternity challenge.[7] The court also found that court-ordered specific steps had been in effect since October, 2017, but the respondent had yet to engage in either mental health or intimate partner violence treatment, which were necessary for him to rehabilitate.

The court also discussed the child's current placement. It found that, in October, 2017, the department placed the child and his half brother with the same foster family, which plans to adopt both children. The child, who remains in that placement, was three years and nine months old at the time of the court's judgment terminating the respondent's parental rights. The court emphasized, pursuant to § 17a-112 (k) (4), the child's strong attachment to his foster family and psychological home.[8] It credited Schroeder's testimony concerning the child's interactions, finding that "[b]oth brothers have thrived . . . and a positive, nurturing and loving parent-child bond exists between both boys and their foster parents." The court found that the child also enjoys a positive sibling bond with his foster parents' three biological children. Disrupting that attachment, as Schroeder opined, would "needlessly place [the child] at risk of emotional and psychological upset or harm."

Finally, the court found that it was not aware of "any person, parent, agency or economic circumstance" that had prevented the respondent from establishing or maintaining a meaningful relationship with the child. The court concluded, on the basis of clear and convincing evidence, that termination of the respondent's parental rights was in the best interests of the child. This appeal followed.

I

The respondent first challenges the court's findings, made pursuant to § 17a-112 (j) (1), that the department made reasonable efforts to reunify him with the child and that he was unable or unwilling to benefit from such efforts. We address these claims together.

Section 17a-112 (j) (1) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, *unless* the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." (Emphasis added.) "Because the two clauses are separated by the word 'unless,' this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or

unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).

"[W]e . . . review the trial court's decision . . . with respect to whether the department made reasonable efforts at reunification for evidentiary sufficiency." (Internal quotation marks omitted.) *In re Corey C.*, 198 Conn. App. 41, 59, 232 A.3d 1237, cert. denied, 335 Conn. 930, 236 A.3d 217 (2020). "[W]e review the trial court's subordinate factual findings for clear error." (Internal quotation marks omitted.) Id. Similarly, in reviewing a trial court's determination that a parent is unable to benefit from reunification services, "we review the trial court's ultimate determination . . . for evidentiary sufficiency, and review the subordinate factual findings for clear error." (Citation omitted.) *In re Gabriella A.*, 319 Conn. 775, 790, 127 A.3d 948 (2015).

A

The respondent first claims that the court's finding that the department made reasonable efforts to reunify him with the child was clearly erroneous. He argues that monthly visits and mere referrals to treatment are not "reasonable" efforts and his incarceration does not excuse the department from satisfying its obligation to make reasonable efforts.[9] We disagree.

"The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Emphasis omitted; internal quotation marks omitted.) *In re Hector L.*, 53 Conn. App. 359, 371, 730 A.2d 106 (1999).

The respondent essentially argues that the department should have gone to greater lengths on his behalf. Specifically, the respondent claims that the department could have provided "hands-on" teaching of parenting skills by a professional, rather than the mere granting of access to the prison library, or "additional services which could be implemented, such as therapeutic visitation, intensive family preservation, parent-child counseling (which can only be implemented when the child is in the home of the parent), as well as other services." (Internal quotation marks omitted.) He also suggests that the department "could at least have contracted with an outside provider to facilitate visits and engage [him] in parenting education at the same time . . . ." We disagree.

Merely arguing that the department could have done

more is not enough to overturn the trial court's finding that the department's efforts were "reasonable" under the circumstances. "[I]n light of the circumstances created by the respondent"; *In re Anvahnay S.*, 128 Conn. App. 186, 192, 16 A.3d 1244 (2011); we cannot conclude that the department's efforts were unreasonable. As this court has stated, the reality is that "incarceration imposes limitations on what the department and its social workers can do and what services it can provide for an incarcerated parent facing termination of his or her parental rights." *In re Katia M.*, 124 Conn. App. 650, 670, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010). The reasonableness of the department's efforts must be viewed in the context of these limitations.

This court has previously concluded that similar efforts by the department were reasonable for the purposes of § 17a-112 (j) (1). In *In re Hector L.*, supra, 53 Conn. App. 371–72, for instance, much like in the present case, the department provided consistent visits with the child and encouraged the respondent to take advantage of parenting and substance abuse programs offered by the Department of Correction. The respondent claimed that "the department 'could have done more' to provide reunification services while he was incarcerated." Id., 371. This court disagreed, concluding that, "[a]lthough the respondent could not avail himself of the programs normally available through the department because of the restraints imposed by his incarceration, he is not excused from making use of available programs offered by the [D]epartment of [C]orrection."[10] Id., 372. See also, e.g., *In re Kamal R.*, 142 Conn. App. 66, 71, 62 A.3d 1177 (2013) ("[w]hile the respondent faults the department for not being more involved in his programs while he was incarcerated, we note that while he was in the custody of [the Commissioner of Correction], the department was unable to offer him services"); cf. *In re Jermaine S.*, 86 Conn. App. 819, 838–39, 863 A.2d 720 (department made reasonable efforts when it recommended programs offered in prison, communicated with respondent's mother, and brought child to correctional facility for two visits with respondent father), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

In the present case, the record supported the court's determination that the department made reasonable efforts to reunify the respondent with the child. The department provided the respondent with the opportunity to visit with the child, which the respondent initially declined until finally requesting visits in August, 2018. Once visits began in September, 2018, the department provided them on a consistent basis. The respondent was provided with final court-ordered specific steps in January, 2018, and, as early as May, 2018, the department encouraged him to avail himself of services and programs offered by his correctional facility. In sum,

the respondent had the opportunity to pursue the therapeutic treatments offered by Cheshire Correctional Institution from at least January 15, 2019, when he was sentenced, onward.[11] The department's efforts to provide visits and to refer the respondent to resources offered by the Department of Correction are in line with efforts that this court has found reasonable in other cases involving incarcerated parents. See, e.g., *In re Jermaine S.*, supra, 86 Conn. App. 838–39; *In re Hector L.*, supra, 53 Conn. App. 371. We, therefore, conclude that the court's finding that the department made reasonable efforts to reunify the respondent with the child was supported by substantial evidence in the record and was not clearly erroneous.

B

The respondent also claims that the court improperly found that he was unable or unwilling to benefit from reunification services for his child because he is presently incarcerated. Relying on the rule that incarceration alone is not a sufficient ground for the termination of one's parental rights; see, e.g., *In re Juvenile Appeal, Docket No. 10155*, 187 Conn. 431, 443, 446 A.2d 808 (1982); the respondent argues that the court's decision must be read to rest entirely on his incarceration. We do not agree with the respondent's characterization.

This court has stated, in the context of a parent's failure to rehabilitate, that although a parent's incarceration cannot form the sole basis for a termination of parental rights, it is a relevant and appropriate factor for the court to consider. See *In re Leilah W.*, 166 Conn. App. 48, 73, 141 A.3d 1000 (2016) (stating that "incarceration nonetheless may prove an obstacle to reunification due to the parent's unavailability" (internal quotation marks omitted)). That principle applies with equal force to the determination of whether a parent is unable or unwilling to benefit from reunification efforts. In finding that the respondent's "present situation renders him incapable of being a meaningful resource for [the child]," the court recognized the reality that the respondent would be unavailable as a resource for the child until at least the fall of 2022, if not until his 2024 maximum release date. The child was only four months old at the time of the respondent's incarceration and, even assuming that the respondent was paroled at the earliest possible release date, during the fall of 2022, the child would "then be a five year old boy who has no emotional connection or comfort level" with the respondent. These circumstances cannot be ignored.

Although the court's analysis of this prong is brief and states, perhaps inartfully, that the respondent's "protracted incarceration . . . renders him unable to benefit from reunification efforts," we do not construe this analysis to mean that the mere fact of the respondent's incarceration was the sole basis for the court's

finding that he was unable to benefit from the department's efforts. Our review of the court's memorandum of decision and the record reveals that the court made ample relevant factual findings concerning the respondent's unresolved mental and emotional issues and his failure to take advantage of the opportunities that the department offered him to treat those issues or to bond with the child during his incarceration. Specifically, the court found that the respondent did not complete the therapeutic treatment required by his specific steps. He does not challenge the court's finding that, as of the time of trial, he had not done so, nor does he even attempt to explain his failure to comply with that specific step. The respondent points only to his participation in *other* programs and services. Although he "participated" in supervised visits, the court credited the department social worker's observation that, when afforded the opportunity to visit with the child, the respondent did "not attempt to interact with [the child] at all." (Internal quotation marks omitted.) Moreover, visits were delayed for almost one year due to the respondent's conduct. He challenged paternity, even when biological testing determined that he was the child's father, delaying the possibility of visits until February, 2018. He then declined to request visits until August, 2018. The respondent has not demonstrated that any of these findings were clearly erroneous. Although the court made these findings in the context of its disposition of the respondent's failure to rehabilitate, they also support its determination that the respondent was unable or unwilling to benefit from the department's reunification efforts. Reading its decision as a whole; see, e.g., *In re November H.*, 202 Conn. App. 106, 118, 243 A.3d 839 (2020) (appellate court reads memorandum of decision in context as whole); we conclude that the court's finding that the respondent was unable or unwilling to benefit from the department's reunification efforts was not clearly erroneous.

## II

The respondent also claims that the court improperly found that he failed to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i).[12] We do not agree.

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under . . . § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase." (Internal quotation marks omitted.) *In re Jacob M.*, 204 Conn. App. 763, 777,     A.3d    , cert. denied, 337 Conn. 909, 253 A.3d 43 (2021), and cert. denied, 337 Conn. 909, 253 A.3d 44 (2021).

"Section 17a-112 (j) (3) (B) requires the court to find

by clear and convincing evidence that . . . the parent of [the] child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Internal quotation marks omitted.) *In re Corey C.*, supra, 198 Conn. App. 66–67.

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Internal quotation marks omitted.) *In re Damian G.*, 178 Conn. App. 220, 237, 174 A.3d 232 (2017), cert. denied, 328 Conn. 902, 177 A.3d 563 (2018).

"[A] conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts . . . . Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous." (Internal quotation marks omitted.) Id.

The essence of the respondent's claim is that the trial court improperly concluded that he failed to rehabilitate because it failed to consider the degree to which the COVID-19 pandemic and his incarceration affected him. In his brief to this court, he argues that "we cannot apply the same standard to [him] in this case . . . when he has not been in a position to receive and engage in service[s] due to circumstances beyond his control, such as the COVID-19 pandemic safety issues."[13] As a result, he claims that the court should have afforded him with further opportunities to engage with resources provided through the department in order to demonstrate that he can rehabilitate. We do not agree.

Although the respondent argues that the court failed to consider the COVID-19 pandemic and the resulting cessation of services, he fails to acknowledge that the relevant date for considering whether he failed to rehabilitate is the date on which the termination of parental rights petition was filed, which in this case was in August, 2019, approximately seven months before the onset of the COVID-19 pandemic in March, 2020. See footnote 9 of this opinion. Although a court "*may* rely

on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time"; (emphasis in original; internal quotation marks omitted) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003); it is not required to do so.

As discussed in part I B of this opinion, the respondent was provided with final specific steps in January, 2018. He did not fully comply with these specific steps, which required him to complete available mental health and intimate partner violence treatment and to visit the child as often as permitted by the department, despite having approximately one and one-half years to do so. Moreover, the respondent appears to concede that he has not fully rehabilitated. In his brief, he admits that "there is no doubt that there were a number of issues that [he] has to deal with in order to reunify with [the child]." The record supports that concession and the trial court's finding that he will not do so within a reasonable amount of time.

As the trial court correctly found, the respondent's failure to engage in the rehabilitative services available to him and to work to improve his parenting skills calls into question his ability to take responsibility as a parent and supports the court's finding that he puts his own needs before those of the child. See *In re Mariah S.*, 61 Conn. App. 248, 266, 763 A.2d 71 (2000) (respondent mother who consistently put her own needs before those of child and did not take visitation and counseling obligations seriously or develop parenting skills failed to rehabilitate), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001); *In re Amy H.*, 56 Conn. App. 55, 60, 742 A.2d 372 (1999) (respondent father who did not take advantage of visits or rehabilitative programs failed to rehabilitate). The court's finding relative to the respondent's lack of engagement and failure to take responsibility also finds support in Schroeder's report, which noted that the respondent blames the mother and does not recognize his own role in the child's removal from the home. The record simply does not support the belief that the respondent could achieve a responsible role in the life of the child within a reasonable period of time.

The question for the court was whether the respondent could rehabilitate in a *reasonable* period of time. See *In re Damian G.*, supra, 178 Conn. App. 237. The court stated that "it will take [the respondent] months, possibly years, to successfully reintegrate himself into the community, and to engage in meaningful, beneficial and direly needed mental health treatment. He would need to exhibit a sustained period of abstinen[ce] from criminal and violent behaviors." The record demonstrates that the respondent has yet to seek said treat-

ment. His anger issues remain as delineated in Schroeder's evaluation, which states that the respondent admitted that he sometimes blacks out in rage. The result, as the court concluded, is that he is "incapable of being a meaningful resource for [the child]" for the foreseeable future. The record supports the court's finding that the respondent's behavioral issues prevent him from assuming the role of a responsible parent in a reasonable time frame.

As a result, we conclude that the court's finding that the respondent failed to rehabilitate was not clearly erroneous. There was sufficient evidence in the record to support the court's findings and we are not left with a definite and firm conviction that a mistake was made.

## III

The respondent next claims that the court improperly found that termination of his parental rights was in the child's best interests. We disagree.

We set forth the applicable law regarding the dispositional phase of a termination of parental rights hearing. "It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 211, 15 A.3d 194 (2011).

"[T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A]lthough a trial court shall consider and make written findings regarding the factors enumerated in § 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Internal quotation marks omitted.) *In re Nevaeh W.*, 317 Conn. 723, 740, 120 A.3d 1177 (2015).

In the present case, the court made findings pursuant

to each of the seven § 17a-112 (k) factors[14] before finding, by clear and convincing evidence, that termination of the respondent's parental rights was in the best interests of the child. The substance of the respondent's claim on appeal concerns his rehabilitation; he claims that it is not in the child's best interests to be separated from his biological father because the respondent can still rehabilitate. This claim lacks merit because, for the reasons set forth in part II of this opinion, the court's determination that the respondent will not be able to assume a responsible position in the child's life within a reasonable time was not clearly erroneous and was supported by substantial evidence. Additionally, the child's interests in stability and permanence in this case outweigh the respondent's interest in the care and custody of his child.

The respondent also fails to recognize that, in the dispositional stage, the emphasis "appropriately shifts from the conduct of the parent to the best interest of the child . . . [t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment." (Internal quotation marks omitted.) *In re Alison M.*, supra, 127 Conn. App. 211. To the extent that the parent's conduct is relevant, "the proper focus is on the ability of the biological parent and how that ability or limitation of ability relates to the best interest of the child . . . ." *In re Paul M.*, 154 Conn. App. 488, 505, 107 A.3d 552 (2014).

Notwithstanding the department's provision of supervised visits and referrals to services, the respondent did not make progress in addressing his issues as required by his specific steps. He claims that he did not have enough time with the child to develop a relationship, but the record contains evidence that he delayed initiating visits with the child and then "squander[ed]" his time with the child when visits occurred. The respondent also made little, if any, effort to stay informed about the child's life outside of the monthly visits. The department's social worker testified that the respondent did not exhibit a bond with the child.

The now four year old child has lived with his maternal half brother in the same foster home since October, 2017, where he has resided since he was approximately four months old. At the time of the court's judgment, the child was three years and nine months old. He has a bond with his foster parents and looks to them for support. He also has a positive relationship with the other children in the home. The foster parents plan to adopt him, thereby affording him long-term stability. Expert testimony in the record indicates that removing the child from the foster home would be not only disruptive, but traumatic. Moreover, the respondent is not expected to be released from incarceration until late 2022, at the very earliest; if released at that point, he

would remain subject to parole. Even then, the court found that it would take months, if not years, for the respondent to find suitable housing and employment, reintegrate into the community, and engage in necessary mental health treatment.

The child needs a permanent and stable environment, which his foster family currently offers and which the respondent cannot provide within the foreseeable future. The court's findings concerning the child's attachment to his foster home stand in sharp contrast to its findings concerning the respondent's unavailability and lack of attachment to the child. See, e.g., *In re Davonta V.*, 98 Conn. App. 42, 49–50, 907 A.2d 126 (2006) (contrasting respondent mother's "serious and long-term history of instability" and absences from child's life with stability of child's foster home), aff'd, 285 Conn. 483, 940 A.2d 733 (2008). "Children cannot wait for years for a determination that they should be returned to their natural parents [or] placed permanently in an adoptive home . . . . The delays that are annoying and frustrating to adults . . . can permanently damage children and their families . . . ." (Internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 314, 709 A.2d 1089 (1998). Given the child's young age and need for stability and permanence, we conclude that the record supports the court's finding that termination of the respondent's parental rights is in the child's best interests.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or other through whom that party's identity may be ascertained.

** August 24, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the respondent mother, Le'eisha F. (mother), who consented to termination and is not a party to this appeal. Because the mother is not participating in this appeal, we will refer in this opinion to the respondent father as the respondent.

[2] At that time, the child's older maternal half brother also was removed from the mother's care. The mother and the half brother's biological father later consented to the termination of their parental rights as to the child's half brother.

[3] The respondent did not visit with the child in December, 2019, because the Department of Correction, for reasons not disclosed in the record, was unable to make the respondent available.

[4] The only evidence of the reason for this delay is the department's social study, which states that the respondent had, at first, refused visits. At trial, the respondent disputed this evidence, testifying that he had requested visits in March, 2018. The court did not find that this testimony was credible, stating in its decision that "[t]he evidence does not support [the respondent's] time line." On appeal, the respondent does not challenge this factual determination.

[5] Due to the COVID-19 pandemic, the Judicial Branch held remote hearings using the Microsoft Teams platform. For more information, see State of Connecticut, Judicial Branch, Connecticut Guide to Remote Hearings for

Attorneys and Self-Represented Parties (November 13, 2020), available at https://jud.ct.gov/HomePDFs/ConnecticutGuideRemoteHearings.pdf (last visited August 20, 2021) ("Microsoft Teams is a collaborative meeting app with video, audio, and screen sharing features").

[6] The court ultimately found that the respondent had failed to rehabilitate. It, therefore, did not reach the alternative ground alleged by the commissioner, lack of an ongoing parent-child relationship. See, e.g., *In re Shane P.*, 58 Conn. App. 234, 242, 753 A.2d 409 (2000) (satisfaction of one statutory ground under § 17a-112 (j) (3) is sufficient).

[7] In finding that the respondent put his own needs before those of the child, the court also considered the respondent's concurrent motion to revoke commitment and transfer guardianship of the child from his foster family to a nonrelative guardian. The respondent had previously expressed a desire that the child and his half brother not be separated. The court quoted the respondent's explanation at trial that "I changed my mind, why should I not be happy?" as indicative of the respondent's sense of entitlement. (Internal quotation marks omitted.) The court denied the respondent's motion in its decision. Although on his appeal form the respondent purports to appeal that order, the respondent has not briefed this issue, and, therefore, we decline to address it.

[8] "[T]he court is statutorily required to address in writing the feelings and emotional ties of the child with respect to . . . any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." (Internal quotation marks omitted.) *In re Joseph M.*, 158 Conn. App. 849, 870–71, 120 A.3d 1271 (2015).

[9] The respondent also argues that the March, 2020 cessation of services due to the COVID-19 pandemic is a factor that should be considered in his favor, as well as his incarceration. The COVID-19 pandemic began *after* the petition to terminate the respondent's parental rights was filed in August, 2019, however, and this court has noted that Practice Book § 35a-7 provides that the trial court generally "is limited to evidence of events preceding the filing of the petition or the latest amendment" in the adjudicatory phase of a termination proceeding." (Internal quotation marks omitted.) *In re Yolanda V.*, 195 Conn. App. 334, 346, 224 A.3d 182 (2020). Moreover, despite the cessation of in person services in March, 2020, the department provided the respondent with services for more than one year *prior* to the COVID-19 pandemic.

[10] This court also noted that the respondent failed to identify "*how such services could have been offered while he was incarcerated*." (Emphasis added.) *In re Hector L.*, supra, 53 Conn. App. 371–72. Similarly, in the present case, the respondent has not demonstrated that, in light of his incarceration, the department could have provided the additional services he claims it should have provided.

[11] The department provided the respondent with initial court-ordered specific steps toward reunification on October 13, 2017, and final specific steps on January 18, 2018. Those specific steps described services that the respondent should have pursued, namely, mental health, parenting, and intimate partner violence treatment, "all as allowed by [the Department of Correction]." See, e.g., *In re Kamal R.*, supra, 142 Conn. App. 71 (respondent provided with specific steps).

[12] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[13] The respondent also appears to argue that the services available to him were insufficient for him to fully rehabilitate. Because we conclude in part I A of this opinion that the department's efforts were reasonable, this aspect of the respondent's claim is not persuasive and we do not address it further in this part of the opinion.

[14] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent

of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

———————————————————